# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

In the matter of:                                )
                                                 )                    Chapter 11 Case
CAPTAIN'S WATCH, LLC                             )
                                                 )                    Number <u>09-42722</u>
                              *Debtor*           )
                                                 )
                                                 )
                                                 )
DARBY BANK & TRUST COMPANY                       )                    **FILED**
Its Successors and/or Assigns                    )            Samuel L. Kay, Clerk
                                                 )         United States Bankruptcy Court
                              *Movant*           )              Savannah, Georgia
                                                 )       By lbarnard at 3:04 pm, Jul 26, 2010
                                                 )
                                                 )
                                                 )
v.                                               )
                                                 )
CAPTAIN'S WATCH, LLC                             )
                                                 )
                              *Respondent*       )

## <u>MEMORANDUM AND ORDER</u>
## <u>ON MOTION FOR RELIEF FROM STAY</u>

### <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Debtor's case was filed on November 30, 2009. On April 29, 2010, Darby

Bank & Trust Company ("Darby Bank") filed a Motion for Relief from Stay seeking

permission of this Court to exercise its state law remedies and foreclose upon the largest

portion of Darby Bank's collateral, a combination residential and commercial condominium

located on Tybee Island, Georgia. While Darby Bank holds collateral positions over tracts

of land and timber located in Toombs County, Georgia, and in fifteen lots located on or near Lake Lanier in north Georgia, the loan that is the subject of this Motion arises out of Debtor's development of the Captain's Watch property on Tybee Island.

Debtor's sole principal, Kenneth Clifton, has for a number of years been a successful real estate entrepreneur and developer in various locations in the southeast, principally in Georgia and South Carolina. He was informed of an investment opportunity at Tybee Island in 2006, and after conducting due diligence arranged to borrow approximately $8 million[1] from Darby Bank to acquire the land. The land had regulatory entitlements already in place for the construction of a multi-story condominium project with ground floor commercial space located on Butler Avenue, the main thoroughfare on Tybee Island. Darby Bank advanced approximately $8 million at a time when reliable appraisals showed that extension of credit to be well within the anticipated value of the property. Indeed, Debtor in analyzing the project had engaged in a market analysis and had pre-sold a number of units which vary in size, but most of which are approximately 1,000 square feet in a two-bedroom / two-bath configuration. Based on Debtor's work prior to and during the development phase, it pre-sold twelve units of the twenty that were included in the plans at various prices, from $545,000.00 to $925,000.00. As part of Debtor's relationship with Darby Bank in the pre-selling phase of the development, Debtor believed that Darby Bank had committed not only to the construction loan, but to provide long-term financing for

---

[1] Except where the precise number is material I will utilize rounded or approximate numbers throughout this opinion.

purchasers as high as one hundred and six percent of the purchase price. It was Debtor's opinion that the closing of the twelve pre-sold units as priced would have been sufficient to pay off the entire $8 million debt. Debtor therefore decided to retain ownership of the remaining eight units and use them for rental purposes.

The project was finished after an approximate ten month construction phase and in fall of 2007 Debtor began closing on units which were then available for immediate occupancy. Darby Bank actually financed several of the units, but prior to closing all twelve loans, its willingness to provide long-term financing vanished. When Debtor inquired as to the reasons why the long-term loans were not being advanced, it was informed that Darby Bank seldom, if ever, made portfolio loans, but had always brokered them to outside mortgage sources and that there was no market for placing mortgage loans in the resort condominium niche of the real estate market after late 2007.

The parties stipulated that there is no equity in this property at the present time. Indeed, the appraisal of Considine and Company, on which the loan initially had been advanced, was updated for the purposes of this hearing and the new appraisal concluded a value of $3,255,000.00. Appraisal Report, Exhibit R-1. Using comparable condominium development units on Tybee located within a very short distance of this property, the appraiser concluded the appraised blended average value of all the units in this development

is approximately $254,000.00[2] per unit.[3] Testimony revealed that with over 100 condominium units currently for sale on Tybee Island, the most recent six months have shown only twenty-eight condominium sales, of which eleven were foreclosures. In the six months prior to that only twenty condominium units were sold. The average price of a 1,000 square foot two-bedroom condominium in this market has fallen from $269,000.00 to $243,000.00 within the last year. More problematic, the subject property has notable problems with moisture, quality of construction and design which were noted by the appraiser, and when coupled with the deteriorating market conditions, has prompted Debtor to convert its anticipated use of the property from a Sales to a Rental business plan.

Beginning last fall, Debtor was successful in arranging multi-month leases of a number of the units, which were then converted at the beginning of the beach season in May of this year to daily and weekly rentals. Debtor anticipates continuing the daily and weekly rental model through the month of August and then intends to convert to longer term rentals over the off-season in an effort to service its debt and propose a confirmable plan.

Debtor has hired counsel and drafted a law suit to attempt to have the

---

[2]This figure represents the average value of three penthouse units, which are larger and have better views and bigger decks, nine standard two-bedroom units, and three "one bedroom plus" units, in which the second room is too small for both a bed and a dresser.

[3]The per unit amount does not multiply out to equal the total appraised amount. The total appraised amount is lower because it is amortized at 12% over 30 months (one unit sold every other month), and includes rental revenue, tax expenses, real estate commission expenses, and upkeep expenses. Summary Appraisal Report, Exhibit R-1, p. 49.

deficient work repaired and to collect damages for the design and construction flaws that plagued the building, but the suit has not yet been filed.  Nevertheless, because Debtor is on notice of the problems in the building it quite reasonably does not foresee that in the short term it would be possible to sell the units even if financing were available and market conditions were better. The appraiser reached a similar conclusion.

When Debtor converted from a Sales model to a Rental model it approached Darby Bank, which agreed to extend Debtor a line of credit in the amount of $350,000.00 in order to furnish the condominiums for rent, and to provide for the payment of 2008 taxes which were then in arrears.  Debtor drew down a substantial majority of that line of credit but left approximately $60,000.00 in escrow.  To support that extension of credit Debtor pledged additional collateral that was not part of the original transaction.

In late July or early August 2009, a quarterly interest payment came due. When Debtor was unable to pay the entire outstanding amount of approximately $80,000.00, Darby Bank called the note.  At that point Debtor was in a position to make a substantial payment toward the outstanding amount of $80,000.00. But in order to fully fund that payment, Debtor needed to draw some of the remaining escrow funds from the line of credit, and Darby Bank refused to permit that advance.  Debtor contends that Darby Bank was unresponsive to requests made to it for full or partial releases of its other collateral in exchange for potential sales of land or timber or the commercial property.  Debtor did sell

one tract of approximately 119 acres and the funds were used to reduce the principal prior to the extension of the line of credit, but no similar payments or releases have been agreed to by the lender.

The testimony of Darby Bank's vice president, Les Ramsey, established that he had no personal knowledge of conversations between the loan officer of Darby Bank and Debtor concerning commitments to provide long-term financing on the twelve units that had been pre-sold, that such an arrangement would have violated Darby Bank's internal policies, and would have been subject to underwriting by the third party mortgage companies providing the funding. He testified that no written commitment to this effect was part of Darby Bank's records. Mr. Clifton, however, believed that he had that commitment in written form and the record was left open for both parties to research their files and supplement their documentary evidence to the extent such written correspondence or other documentation is discovered. These documents were subsequently filed. Letter, Dckt. No. 53 (June 22, 2010). While they evidence an active effort to place permanent loans for purchasers of these units, there is nothing which remotely meets the standard for proving a loan commitment. See Oceanmark Bank, F.S.B. v. Stubblefield, 230 Ga. App. 399, 400 (1998) ("To be binding, any commitment to lend money must be in writing and signed by the party to be charged or some person lawfully authorized by him.") (citing O.C.G.A. § 13-5-30(7)); id. ("Unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, the agreement is of no effect.") (citing Bridges v. Reliance Trust

◆AO 72A
(Rev. 8/82)

Co., 205 Ga. App. 400, 402(2) (1992) and Beasley v. Ponder, 143 Ga. App. 810 (1977).

The total indebtedness as of the date of filing on the original loan and the line of credit is $8.4 million.  It is therefore clear that the Movant has met its burden of showing lack of equity and the question is whether Debtor has carried its burden of proving that this property is necessary to an effective reorganization under § 362(d)(2)(B).  In connection with that, Debtor asks the Court to deny the Motion subject to its tendering $15,000.00 per month adequate protection payments until a Disclosure Statement and Plan can be proposed and ruled on by the Court. Darby Bank objects to the Court establishing any level of adequate protection, but further argues that the proposed amount would be insufficient inasmuch as the contract interest accrual is over $20,000.00 per month and the property is further encumbered by accruing taxes, the amount of which are in dispute.

The test for showing necessity under § 362(d)(2)(B) is articulated in United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., which interprets the requirement that the property not be necessary to an effective reorganization as follows:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

&AO 72A
(Rev. 8/82)

Timbers, 484 U.S. 365, 375-76 (1988).

I conclude after an examination of the documents and the evidence produced at trial that Debtor has failed to carry its burden. The disastrous loss of value in this property mirrors, and to some extent exceeds in magnitude, the dismal state real estate values that have come before this Court. Debtor is a long-successful, sophisticated investor and developer, and Darby Bank is a community bank which carries a solid reputation in this area. There is no doubt that both Debtor and Darby Bank examined this transaction at the inception based on all the information available to them and believed that this was a viable project supported by adequate value and a strong real estate market, which could be successfully concluded with some profit to the developer and loan repayment with interest to Darby Bank. However, extraordinary changes in the real estate market beginning in 2007 completely destroyed that expectation, as evidenced by the fact that the property is now stipulated to be worth less than half what all parties believed in good faith it was worth less than three years ago.

Although Debtor believes that Darby Bank has been unreasonable in refusing certain requests it has made for partial releases of property to permit its sale, and although Debtor believes that Darby Bank violated a commitment to provide permanent financing for all condominium purchasers, the Court's attention has not been directed to any document which illustrates that the lender has violated any provision of its contractual

obligations to Debtor. If Debtor has any legally sustainable claim against the lender, it may be asserted in a different forum in a different time, but for the purposes of this Motion it has not been established. To the contrary, the property dropped precipitously in value before the case was filed, has eroded in value somewhat since the case was filed, and is the subject of substantial uncorrected construction defects which further impair its marketability for sale and ultimately may impair its marketability for rent if not corrected.

While Debtor anticipates a lawsuit which it believes in good faith will result in some repair work and a damage award, that lawsuit has not yet been filed and any recovery is speculative as to amount and timing. The property enjoys solid bookings at this time, as it should in the height of the tourist season, but despite income which may reach $50,000.00 per month in season, Debtor can only reasonably propose $15,000.00 in adequate protection payments on an interim basis. Given the interest accrual which exceeds that amount and an accrual of taxes, which if unpaid constitute a further impairment of Darby Bank's lien, I find that the proposal is insufficient to provide adequate protection in the short term. Moreover, when the lower cash flow off-season months arrive, it is clear that the impairment of Darby Bank's position will only worsen.

This property is a classic Timbers situation. It is necessary for Debtor to retain the property if there is any possibility of a plan succeeding. But the test requires more, it must be a plan with a reasonable prospect of success within a reasonable time. With

AO 72A
(Rev. 8/82)

continued erosion in value, inadequate cash flow to cover that loss, a lack of capital to correct the building deficiencies, and uncertainty surrounding the litigation to correct the project's deficiencies, Debtor has been unable to show a reasonable prospect of success in a reasonable time.

## O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that Darby Bank & Trust Company's Motion for Relief from Stay is  GRANTED.  Debtor retains any rights it may have with respect to Darby Bank's administration of this loan and for the assertion of claims against any party or parties it believes may be responsible for the deplorable condition in which the condominium development is currently situated.

_____

Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 23rd day of July, 2010.

AO 72A
(Rev. 8/82)